# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | Crim. A. No. 1909016237 |
| | ) | |
| JEFFREY A. KING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMMISSIONER'S REPORT AND RECOMMENDATION DENYING DEFENDANT JEFFREY A. KING'S MOTION FOR MODIFICATION OF SENTENCE

This 23rd day of May, 2024, upon consideration of Defendant's Motion for Modification of Sentence;[1] the State's Response to Defendant's Motion for Modification of Sentence;[2] Defendant's Second Supplement to the Motion to Modify Sentence;[3] Defendant's Third Supplement to the Motion to Modify Sentence;[4] Defendant's Fourth Supplement to the Motion to Modify Sentence;[5] the Department of Corrections ("DOC") Preferred Medication List;[6] Defendant's Memorandum Argument Filed in Support of Defendant's Motion to Modify

---

[1] Docket Item ("D.I.") 68.
[2] D.I. 72.
[3] D.I. 97.
[4] D.I. 79.
[5] D.I. 80.
[6] D.I. 81.

Sentence;[7] the State's Supplemental Briefing on Motion for Sentence Modification;[8] and the record in this matter, the following is my Report and Recommendation.

## I.     PROCEDURAL HISTORY

On September 30, 2019, a New Castle County Grand Jury indicted Defendant Jeffrey A. King ("Defendant") for two counts of Unlawful Sexual Intercourse First Degree.[9] On May 10, 2022, Defendant pled guilty to one count of Unlawful Sexual Intercourse Third Degree and one count of Unlawful Sexual Penetration Third Degree.[10] On October 14, 2022, this Court sentenced Defendant to an aggregate term of imprisonment of fifteen years at Level V, suspended after serving ten years, followed by two years Level III probation.[11] This Court's sentence Order noted the following aggravating and mitigating factors: need for correctional treatment, undue depreciation of the offense, and Defendant's physical/mental impairment.[12]

On December 12, 2022, Defendant filed a Motion for Home Confinement/Compassionate Release pursuant to Superior Court Criminal Rule 35(b).[13] In support of the Motion, Defendant cited his declining health, medical

---

[7] D.I. 91.
[8] D.I. 94.
[9] D.I. 2. On May 5, 2022, the State filed an Information charging Defendant with one count of Unlawful Sexual Intercourse Third Degree and one count of Unlawful Sexual Penetration Third Degree. D.I. 54.
[10] D.I. 55.
[11] D.I. 58.
[12] *Id.*, p. 6.
[13] D.I. 62.

complications, and alleged poor medical treatment, including DOC's failure to properly administer prescription medication.[14] On January 4, 2023, this Court denied Defendant's Motion for Modification of Sentence.[15]

On February 22, 2023, Defendant filed a second Motion for Modification of Sentence ("Motion") pursuant to Superior Court Criminal Rule 35(b).[16] On September 7, 2023, this Court held an evidentiary hearing. On November 22, 2023, Defendant's counsel filed a Memorandum in Support of his Motion for Sentence Modification.[17] On December 18, 2023, the State submitted its Supplemental Briefing Following the Hearing on a Motion for Sentence Modification.[18]

## II.    BACKGROUND FACTS[19]

On August 4, 1993, a woman (the "Woman") was attacked in Newark, Delaware. The attacker took her clothing and her identification card. The attacker penetrated her vaginally with his penis. The attacker then fled with her personal items including the Woman's "North Carolina driver's license, University of Delaware ID, 'Carolina' t-shirt, denim shorts and panties." The Woman immediately reported the attack to police. The police initiated an investigation. The Woman

---

[14] *Id.*
[15] D.I. 64.
[16] D.I. 68.
[17] D.I. 91.
[18] D.I. 94.
[19] These facts were first recited in this Court's opinion granting in part, and denying in part, Defendant's Motion to Suppress Evidence. D.I. 45, *State v. Jeffrey King*, 2021 WL 211150, at *1-2 (Del. Super. Jan. 21, 2021).

underwent a Sexual Assault Nurse Examination ("SANE") during which her vagina was swabbed for DNA. The police were unable to solve this case in 1993.

The police reopened and reassigned the case to Detective Gerasimov in November 2017. Investigators identified Mr. King as a suspect.

In August 2019, Newark Police Department detectives conducted surveillance on Mr. King, his residence and place of employment. On August 14, 2019, Mr. King purchased a Wawa iced tea in a plastic bottle, drank from the bottle and placed the bottle in a plastic Wawa bag. Mr. King subsequently discarded the plastic Wawa bag containing the empty plastic Wawa iced tea bottle in a Walmart trash can.

Investigators seized the plastic Wawa bag from the Walmart trash can and sent the Wawa iced tea bottle to the Delaware Division of Forensic Science to process for DNA evidence. The Division of Forensic Science prepared a report comparing swabs from the Wawa iced tea bottle to the vaginal swabs from the SANE kit. The report indicated that the vaginal swab matched the bottle sample. The probability of randomly selecting an unrelated individual with a matching DNA profile was one in > 7,000,000,000,000 (7 trillion). Using this information, the Newark Police Department obtained a search warrant permitting them to obtain DNA from Mr. King by buccal swab or blood draw.[20]

_____

[20] D.I. 34, *State's* Response to Defendant's Amended Motion to Suppress Buccal Swabbing, at 3. ("The Defendant's DNA profile was compared to the DNA profile taken from K.V. during the

## III.  STANDARD OF REVIEW

Motions for Modification of Sentence are governed by Superior Court Criminal Rule 35(b) ("Rule 35(b)").  Rule 35(b) contains two procedural bars:  the first precludes the consideration of repetitive motions for sentence modification;[21] the second requires a Defendant to file a motion for sentence modification within ninety days of the imposition or sentence, and if a Defendant fails to comply with the ninety day deadline, he must demonstrate "extraordinary circumstances" for this Court to consider the merits of an untimely filed motion.[22]  Both procedural bars are in play here.  As is discussed *infra*, this is Defendant's second Motion for sentence modification, and therefore the Motion is procedurally barred as successive.  Moreover, even if the successive Motion was not procedurally barred, it was filed more than ninety days after the imposition of sentence, and Defendant has failed to demonstrate "extraordinary circumstances" to avoid the application of the Rule 35(b)'s second procedural bar.

## IV.  PARTIES' CONTENTIONS

Defendant's Motion is premised upon his claim of having a "serious medical condition and infirmary,"[23] and an assertion that DOC exhibits a "repeated and

---

SANE exam, which again produced a match, with the same likelihood of randomly selecting an unrelated individual with a DNA profile matching that of the sample of one in seven trillion.")

[21] *State v. Redden*, 111 A.3d 602, 608-09 (Del. Super. Feb. 16, 2015).

[22] *State v. Comrie*, 2017 WL 1403324, at *1 (Del. Super. Apr. 17, 2017).

[23] D.I. 68, Defendant's February 22, 2023 Motion to Modify Sentence, ¶ 6.

continual failure to provide reasonable medical care."[24]  Since his incarceration, Defendant claims DOC has (1) chronically failed to provide him with his medication as ordered by his personal doctors;[25]  and (2) "made ineffective substitutions for certain medications in opposition to his personal physicians' and specialists' recommendations and failed entirely to prescribe others."[26]  Additionally, Defendant argues that if this Court were aware of his medical condition(s) at the time he first filed the Motion for Home Confinement/Compassionate Release on December 12, 2022, he would have received a "lesser sentence."[27]  Defendant contends he is not a "substantial risk to society," and under these specific circumstances his medical condition constitutes "good cause for compassionate release."[28]  Defendant seeks to be resentenced to serve the balance of his sentence at home confinement in Pennsylvania.

The State contends the Defendant has failed to establish "extraordinary circumstances" to justify relief pursuant to Rule 35(b).  First, the State argues Defendant's medical needs are neither unique nor significantly complicated, and DOC medical staff regularly treats chronically ill inmates who are in equally poor

---

[24] *Id.* at ¶ 7.
[25] *Id.* at ¶ 12.
[26] *Id.* at ¶ 15.
[27] *Id.*
[28] *Id.* at ¶¶ 20-21.

(or worse) medical conditions than Defendant.[29] Second, DOC has experience administering prescribed medications for the chronically ill.[30] Third, to the extent Defendant's medical records at DOC were incomplete, those documentation issues, as well as prescription medication administration issues, have been corrected.[31] Fourth, the State asserts Defendant is receiving reasonable and appropriate medical care.[32] And finally, the State claims the Defendant cannot prove his worsening conditions are the result of any actions taken by the DOC.[33]

## V. DISCUSSION

Superior Court Criminal Rule 35(b) may provide an inmate relief from a previously imposed sentence, but it includes two procedural bars in recognition of this Court's interest in upholding the finality of sentences. Rule 35(b) provides, in pertinent part:

> RULE 35. CORRECTION OR REDUCTION OF SENTENCE
>
> **(b) Reduction of Sentence.** The court may reduce a sentence of imprisonment on a motion made within 90 days after the sentence is imposed. This period shall not be interrupted or extended by an appeal, except that a motion may be made within 90 days of the imposition of sentence after remand for a new trial or for resentencing. The court may decide the motion or defer decision while an appeal is pending. The court will consider an application made more than 90 days after the imposition of sentence only in extraordinary circumstances or pursuant

---

[29] D.I. 94, State's Supplemental Briefing Following the Hearing on a Motion for Sentence Modification, at 3-4.

[30] *Id.*

[31] *Id.* at 4-6.

[32] *Id.*

[33] *Id.* at 6-7.

to 11 *Del. C.* § 4217. The court will not consider repetitive requests for reduction of sentence. The court may suspend the costs or fine, or reduce the fine or term or conditions of partial confinement or probation, at any time. A motion for reduction of sentence will be considered without presentation, hearing or argument unless otherwise ordered by the court.[34]

As the moving party, a Defendant who files an untimely motion for sentence modification bears the "heavy burden" of establishing "extraordinary circumstances."[35]  As this Court explained in *State v. Jones*,

> The term 'extraordinary circumstances' is generally defined as '[a] highly unusual set of facts that are not commonly associated with a particular thing or event.' 'And for the purposes of Rule 35(b), 'extraordinary circumstances' have been found only 'when an offender faces some genuinely compelling change in circumstances that makes a resentencing urgent.'  In short, Rule 35(b) is a rule limited to reconsideration and altering of a sentence after the 90-day motion deadline 'only when there is a truly compelling change in that inmate's individual circumstances that presents an urgent need for revision of the sentence's terms.'[36]

Here, Defendant asks the Court to consider Defendant's chronic health conditions in the context of his claim that DOC is providing inappropriate, deficient, and untimely medical care, including the untimely, undocumented, and erroneous administration of prescription medications, to demonstrate extraordinary circumstances warranting consideration of a sentence modification.

---

[34]  Super. Ct. Crim. R. 35(b).
[35]  *State v. Jones*, 2020 WL 4483673 at *2 (Del. Super. Aug. 4, 2020).
[36]  *Id.* (internal citations omitted).

### 1. Procedural Bars.

Before the Court considers the merits of a Rule 35(b) motion, a Defendant must overcome the procedural bars of Rule 35(b). Those procedural bars are addressed below.

#### a. Repetitive Rule 35 Motions.

Rule 35(b) contains a procedural bar when a Defendant submits "repetitive requests for reduction of sentence."[37] As this Court noted in *State v. Redden*,[38] "found in Rule 35(b) is [an] unforgiving bar: '[t]he [C]ourt will not consider repetitive requests for reduction of sentence.' . . . . this bar is absolute and flatly 'prohibits repetitive requests for reduction of sentence.'"[39]

Defendant filed his first Motion to Modify Sentence on December 12, 2022.[40] In that motion, Defendant raised virtually identical claims for relief to the ones he raises here: Defendant suffers from "permanent, irreversible, degenerative, progressive [and] debilitating disease[s];" He has been diagnosed with and has been treated in the community for degenerative joint disease, COPD, and severe asthma; and generalized "Medication/Environment Issues"[41] due to his imprisonment. He

---

[37] *Id.*

[38] *Redden*, 111 A.3d at 608-09 (citing *Thomas v. State*, 2002 WL 31681804, at *1 (Del. Supr. Nov. 25, 2002)).

[39] *Id.* (internal citations omitted). *See also State v. Riddock*, 2022 WL 17820366, at *7 n. 117 (Del. Super. Dec. 19, 2022) ("[U]nlike the 90-day jurisdictional limit with its "extraordinary circumstances" exception, the bar to repetitive motions has no exception.")

[40] D.I. 62.

[41] *Id.* at ¶ 4.

also claims DOC is incapable of providing him with appropriate medications and treatment, including "specialist prescribed medications."[42]  As noted *supra*, on January 4, 2023, this Court denied Defendant's first motion for sentence modification.

On February 22, 2023, Defendant filed this second Motion for sentence modification.[43]  As such, this Motion is procedurally barred as successive.[44]

**b. Defendant's second, untimely filed Motion fails to establish "extraordinary circumstances."**

Assuming *arguendo* that Defendant's Motion is not procedurally barred as successive, Rule 35(b) requires that an application to modify a sentence be filed within ninety days after sentence is imposed.  Here, Defendant's motion was filed on February 22, 2023, more than ninety days after sentencing.

However, Rule 35(b) contains an exception to the ninety day limitation - when a motion to reduce a sentence is filed more than ninety days after the imposition of sentence, "the Court will consider whether 'extraordinary circumstances' exist that would warrant consideration of an untimely Motion for Sentence Reduction."[45]

---

[42] *Id.*

[43] D.I. 68.

[44] *See also Teat v. State*, 2011 WL 4839042, at *1 (Del. Oct. 12, 2011) ("[Defendant's] Motion for Sentence modification may be affirmed on the independent and alternative ground[] that the [second] motion was repetitive"); *Jenkins v. State*, 2008 WL 2721536, at *1 (Del. July 14, 2008) ("Rule 35(b) also prohibits the filing of repetitive sentence reduction motions. . .. It is clear that Jenkins' motion was both repetitive and untimely").

[45] *Comrie*, 2017 WL 1403324, at *1.

Extraordinary circumstances are defined as "[a] highly unusual set of facts that are not commonly associated with a particular thing or event."[46] As noted earlier, "[a] heavy burden is placed on the inmate to establish 'extraordinary circumstances' in order to uphold the finality of sentences."[47]

Delaware law provides the DOC is tasked to provide reasonable standards and reasonable health, medical and dental services for an inmate in its custody. Specifically, Title 11 of the Delaware Code, § 6536(a) provides, in pertinent part:

> The [DOC] shall promulgate reasonable standards, and shall establish reasonable health, medical and dental services, for each institution, including preventive, diagnostic and therapeutic measures on both an out-patient and hospital basis for all types of patients. The nature and extent of such medical and dental services shall be determined by the Commissioner of Correction in consultation with the Bureau Chief of Correctional Healthcare Services. The [DOC] may authorize, under regulations, inmates to be taken, with or without guard, to a medical institution or facility outside the institution.[48]

Based on a plain reading of § 6536(a), Delaware law does not: (1) permit an inmate in the care of DOC to demand or insist on treatment by their personal physician(s); (2) require DOC medical staff to adopt treatment plans which may have been crafted for an inmate by their personal physicians; or (3) require DOC to administer a particular prescription medication regimen recommended by an

---

[46] *Jones*, 2020 WL 4483673, at *2 (citing *State v. Diaz*, 2015 WL 1741768, at *2 (Del. Apr. 15, 2015)).
[47] *Id.*
[48] 11 *Del. C.* § 6536(a).

inmate's personal physician. That being said, in the context of a Rule 35(b) motion, extraordinary circumstances have been found when there is a repeated and continual failure to provide reasonable medical care to persons under the control of DOC.[49]

Defendant asserts he has established extraordinary circumstances to overcome the exception to the ninety-day limitation, and this Court should consider the merits of his claims and grant him relief. Defendant argues: (1) DOC's "repeated and continual failure to provide reasonable medical care" constitutes "extraordinary circumstances" warranting a modification of his sentence; [50] (2) DOC cannot properly administer prescription medications;[51] (3) DOC improperly declined to prescribe or substituted medications which had been prescribed by his personal physicians before his incarceration;[52] and (4) if this Court were aware of Defendant's health conditions in the context of DOC's alleged substandard care, it would have granted his prior motion for sentence modification.[53] Each of these claims will be addressed *infra*.

### (1) Defendant's claim of uniquely complicated medical needs.

Defendant argues that his "uniquely complicated medical needs" impede DOC's ability to provide him reasonable health and medical services. Prior to being

---

[49] *See State v. DeRoche*, 2003 WL 22293654, at *3 (Del. Super. Aug. 29, 2003).
[50] D.I. 68, Motion to Modify Sentence, ¶ 7.
[51] *Id.* at ¶¶ 13-14.
[52] *Id.* at ¶ 15.
[53] D.I. 91, Memorandum Argument in Support of Jeffrey King's Motion to Modify Sentence at 10-11.

incarcerated, Defendant was diagnosed with: (a) intention tremors; (b) severe asthma; (c) chronic bronchitis; (d) chronic obstructive pulmonary disease ("COPD"); (e) sleep apnea; (f) lumbar spondylosis; and (g) radiculopathy.[54] Defendant has suffered from all of these infirmities long before his incarceration at DOC.[55]

To support Defendant's claims, at the September 7, 2023 evidentiary hearing, Defendant offered the testimony of Dr. Zabir Zanjani, MD, Dr. Justin Roh, MD, and Dr. Robert Satriale, MD, three physicians who had been treating Defendant's conditions in the community prior to his incarceration. The testimony of each physician will be briefly discussed below.

Dr. Zabir Zanjani ("Dr. Zanjani") testified that Defendant has suffered from tremors since 2011, and Defendant's tremors are a progressive condition which, if left untreated, can become disabling.[56] And, the prognosis for Defendant is guarded -- even if he takes his medications as prescribed, the tremors are expected to

---

[54] D.I. 68, Defendant's Motion, Exh. 3.
[55] *Id.* Defendant also has a medical history which includes severe alcohol abuse, which resulted in a neurocognitive disorder adversely affecting Defendant's short- and long-term memory.
[56] D.I. 96, Sept. 7, 2023 Evidentiary Hrg. Tr. at 4:16 – 5:10. In fact, Defendant attributes his worsening tremors to a bout of COVID in January 2020, not to any event or condition caused by DOC. *Id.* at 185:3-13.

13

progressively worsen.[57]  Dr. Zanjani treated Defendant's tremors with daily medications -- Clonazepam, Gabapentin and Primidone.[58]

Dr. Justin Roh ("Dr. Roh") treated Defendant in the community for chronic low back pain and left leg pain.[59]  The underlying cause of Defendant's pain is degenerative disk disease,[60] which, if left untreated, may become debilitating.[61] Potential progressive treatments for degenerative disk disease include physical therapy, prescription medication, interventional treatment (injections), and surgery.[62]

According to Dr. Roh, in 2022 Defendant was ordered to complete physical therapy to address his back and leg pain, but Defendant believed physical therapy made his pain worse, so it was discontinued.[63]  Next, Dr. Roh prescribed Defendant Gabapentin to "control the pain a little bit better."[64]  Specifically, Defendant was prescribed 600 milligrams of Gabapentin three times daily, which he described as

---

[57] According to Dr. Zanjani the prescribed medications were treating tremor symptoms but were not "curing anything."  *Id.* at 8:21-23.

[58] *Id.* at 20:7-11.  As discussed *supra*, DOC substituted Topiramate for Clonazepam, but according to the Defendant, the Topiramate "did not help much."  *Id.* at 18:7-21.  Defendant also told Dr. Zanjani that Gabapentin was not helping treat the tremors.  *Id.* at 7:6-9.

[59] *Id.* at 26:7-10.

[60] *Id.* at 48:20-23.  Defendant's spouse, Jessica King, testified that Defendant suffered back pain ever since they first met in 2017, and attributed his pain to his career as a truck driver.  *Id.* at 201:5-13.

[61] *Id.* at 26:14-21.

[62] *Id.* at 27:4-12.  Dr. Roh described a "multimodal approach" to treating this condition, where several different treatments are combined.  If the multimodal approach proved ineffective, then surgery was a "last resort" option.  *Id.* at 27:3-12.

[63] *Id.* at 27:17 – 28:3.

[64] *Id.* at 28:3-7.

the "most researched or the most sort of recommended dosage."[65]   Dr. Roh also encouraged Defendant to increase his physical activity in terms of exercise (e.g., walking), as exercise would be expected to have a positive impact on Defendant's pain.[66] Dr. Roh explained, however, that if Defendant did not exercise and take Gabapentin, his physical condition would continue to deteriorate, resulting in worsening pain.[67]

Finally, Dr. Robert Satriale ("Dr. Satriale") began treating Defendant in the community for asthma, reflux, obstructive sleep apnea and COPD.   Defendant's symptoms were "severe" for many years prior to Dr. Satriale's treatment.[68]  To treat Defendant's conditions, in the community, Dr. Satriale prescribed various prescription medications, including   Dexilant,[69] Montelukast,[70] and Breztri.[71] Additionally, Defendant uses a CPAP machine to manage sleep apnea.[72]   And, regardless of medication administration, Dr. Satriale opined that Defendant will,

---

[65]   *Id.* at 32:20-22.   Dr Roh also acknowledged patients may be prescribed Gabapentin once or twice daily. *Id.* at 38:5- 39:1.

[66]   *Id.* at 28:9-14.

[67]   *Id.* at 43:15-22.   While the Defendant is currently taking Gabapentin, he is not exercising in prison.   Despite acknowledging he has the ability to exercise in prison, when asked how much he exercised, Defendant stated "slim to none." *Id.* at 181:9-13.   And Dr. Roh could not attribute Defendant's increased pain to a modification of the administration of Gabapentin by DOC medical staff or Defendant's deteriorating physical condition due to his failure to exercise. *Id.* at 46:11-14.

[68]   *Id.* at 62:11-20.  In 2013, Defendant "had a very severe exacerbation that almost took his life." *Id.* at 64:2-4.

[69]   *Id.* at 66:6-15.

[70]   *Id.* at 66:16-22.

[71]   *Id.* at 67:15-68:8. The DOC substituted Advair for Breztri. *Id.* at 68:17-69:2.

[72]   *Id.* at 70:11-23.

over time, continue to experience a progressive decline in lung function, resulting in permanent impairment.[73] And, if Defendant does not take his medications as prescribed, he is "at high risk of hospitalization and death."[74]

All of Defendant's ailments, save for COPD, are long-standing illnesses treated with medication. Additionally, while Defendant was encouraged to exercise, he does not do so. And the prognosis for all of his ailments is guarded – in fact most illnesses are expected to progressively worsen. But, Defendant's ailments are common medical conditions, and they are not so unique or complicated that DOC cannot administer necessary medications or otherwise provide reasonable medical care as required to meet Defendant's medical needs. And the record does not reflect that any prior challenges DOC may have faced in treating Defendant or delivering medication to him caused harm or worsened his conditions.

### (2) DOC's administration of prescription medication.

Defendant's second complaint is the alleged failure of DOC to properly administer medication as prescribed by his personal physicians, and for the first eleven months of Defendant's incarceration, Defendant argues his DOC medical records support this claim, as Defendant asserts the records evidence more than 191

---

[73] *Id.* at 87:13 - 88:15. Defendant was also prescribed Prednisone and had been on a Prednisone regimen for fifteen years. *Id.* at 90:8-14. Potential side effects of taking Prednisone for an extended period of time include thinning bones, high blood pressure, diabetes, weight gain, muscle problems, and infections. *Id.* In fact, Prednisone likely caused Defendant's bone density issues, along with other symptoms. *Id.* at 69:13-21.

[74] *Id.* at 76:16-20.

missed doses of medication.[75] This failure to properly administer medication, he asserts, constitutes "exceptional circumstances" warranting a sentence modification.

In response, the State concedes that, for a time, "there were issues [at DOC] surrounding the documentation of [prescription] medicine."[76] To provide one example, Defendant's medical records from the month of April 2023 were incomplete, evidencing "empty data fields."[77] But, the testimony adduced during the evidentiary hearing demonstrates DOC identified and addressed the issues surrounding the administration of prescription medication and corrected medical record issues through training and documentation modifications.

Specifically, to address Defendant's claim of improper prescription medication administration, Dr. Awele Maduka-Ezeh ("Dr. Maduka"), the DOC Medical Director, testified that she personally reviewed Defendant's medical records, and this review caused her to conduct a DOC-wide review of all prison facilities and the processes by which medical staff administered and recorded medication distribution. As Dr. Maduka explained,

---

[75] Defendant argues this Court should "presume the medications were not administered because there is no proof" they were administered. D.I. 91 at 8. But Defendant also suggests this Court can consider Defendant's many grievances filed with DOC as evidence of failure to administer medication. But, when reviewing Exhibit 9 from the evidentiary hearing, the grievances include numerous copies and duplicates, and when those duplicates and copies are eliminated, there remain forty-seven missed or reduced dosages of eleven different medicines in the grievances filed prior to September 2023. D.I. 86, Exh. 9.

[76] D.I. 96, at 4.

[77] *Id.*

So as soon as I saw [Defendant's records], I was very concerned because, again, to [Defendant's counsel's] point, it raises the question are these meds not being given or are they just not being recorded. And so I reached out to the staff at HRYCI to say what is happening. And they said, well, they are giving the patients their medicine, but unfortunately, which should not have happened, [the nursing staff] are not going back to record. And so my first reaction was, is this just for this gentleman or do we have a problem across the system.[78]

Dr. Maduka then contacted the Howard R. Young Correctional Institution's ("HRYCI") IT department and discovered medical staff were not properly recording medications provided to inmates, including Defendant.[79] She then expanded the investigation and discovered similar issues across all DOC facilities.[80] As a result of these investigations, DOC began holding its medical contractor accountable for documentation issues,[81] as well as holding DOC facility staff accountable for proper medication administration and accurate inmate medical record documentation.[82] DOC also modified the prescription medication reporting system, instituted training for the nursing staff, and allowed nursing staff who administered daily medications to inmates to edit an individual inmate's medical records to insure the records accurately reflect the reasons why a dose of specific medicine may not have been consumed by an inmate.[83]

---

[78] D.I. 96, Sept. 7, 2023 Evidentiary Hrg. Tr. at 101:23 – 102:10.
[79] *Id.* at 102:11-22.
[80] *Id.*
[81] *Id.* at 104:9-23.
[82] *Id.* at 105:1-14.
[83] *Id.* at 105:22 – 106:6.

To the extent DOC may not have consistently provided Defendant with medication as prescribed by DOC medical staff and did not properly document his medical records, those problems were corrected by August of 2023. Defendant conceded as much during the evidentiary hearing, testifying that since August of 2023, he received all but *one dose* of daily medication.[84]

Additionally, in considering the above, I find Defendant's claim of missing 191 doses of medication to be overstated. As noted above, Delaware law does not require DOC to follow or adopt prescription medication orders from an inmate's community-based physicians, and physicians are not required to adopt medications orders from another physician. According to Dr. Maduka,

> [o]ne physician cannot give an order to another physician. So those – whatever the doctors write for John Doe, say "I think you should take X, Y and Z X number of times, the primary care physician, which would be [DOC] Dr. Martin, takes all of that into consideration with the patient in front of her and decides do I think these recommendations are good for my patient, or do I need to make adjustments?[85]

Defendant's claim of 191 missing doses also appears to include the DOC medical staff's modification of Gabapentin administration from three to two doses per day, and the elimination of Clonazepam administered twice daily.[86] Moreover, as noted

---

[84] *Id.* at 196:20 – 197:6. While conceding Defendant's medical records with respect to prescription medication administration were incomplete, Dr. Maduka did not believe Defendant had missed 191 doses of medication since his incarceration. *Id.* at 99:14 – 100-1; 101:6-10.

[85] D.I. 96, Tr. at 117:9-17.

[86] Clonazepam is a medication with addictive qualities, and DOC recognizes there are many inmates who enter the prison system with "severe forms of drug abuse." *Id.* at 132:1-3. And the prison environment contains an illicit market for medicines like Clonazepam, a benzodiazepine

*supra*, Defendant's grievance forms do not support Defendant's claim that he missed 191 doses of medication.[87] The record does not support Defendant's claim of "extraordinary circumstances" which require a reconsideration of the original sentence due to prescription medication administration and documentation issues, nor has Defendant established any harm from the medications he may not have been administered prior to September 2023.

### (3) DOC made inappropriate medication substitutions and deletions.

Defendant contends that DOC has made inappropriate substitutions and deletions to the prescription regimen he was prescribed by his community-based physicians, and these substitutions and/or deletions have worked to his detriment, compromising his health. As noted above, DOC medical staff is under no obligation to follow another doctor's prescription medication orders, but even assuming that obligation exists, the record does not support Defendant's argument.

Upon admission to HRYCI, the medical staff requested and received from Defendant's family a list of Defendant's medications, medical providers, and any

---

and controlled substance, amongst inmates with drug abuse issues. *Id.* at 132:4 – 133:1. For these reasons, DOC administers Clonazepam as a "last resort" to inmates given its addictive qualities and potential for being considered a "currency" in the prison, subject to abuse by inmates. *Id.* at 132:11-21.

[87] D.I. 86, Defendant's Exh. 9, Sept. 7, 2023 Evidentiary Hrg. The grievance forms also evidence Defendant's repeated assertion that he believed DOC was incapable of providing him medical treatment as determined by his personal physicians, and a demand that he be permitted to return home where he could receive community-based care. *Id.*

pharmacies from which Defendant would obtain medication in the community.[88] The DOC then reached out to Defendant's respective doctor's offices to determine if there were specific concerns the DOC medical staff should be aware of, and neither Dr Zanjani, Dr. Roh, nor Dr. Satriale responded to DOC's inquiry.[89] Once incarcerated, Dr. Jacqueline Martin, the Medical Director of HRYCI, reviewed Defendant's existing prescriptions and medical records, and conducted an examination and evaluation.[90] It was after that review that Dr. Martin adjusted some of Defendant's prescription medications.

Defendant contends he should still receive Clonazepam prescribed by Dr. Zanjani. However, Clonazepam is a medication with addictive qualities, and DOC is aware there are many inmates who enter the prison system with "severe forms of drug abuse."[91] And, the prison environment contains an illicit market amongst inmates with drug abuse issues for medicines like Clonazepam, a benzodiazepine and controlled substance.[92] For these reasons, DOC administers Clonazepam as a "last resort" to inmates given its potential for being considered a "currency" in the prison, subject to inmate abuse.[93]

---

[88] *Id.* at 147:1-4.
[89] *Id.* at 151:16 – 152:15.
[90] *Id.* at 144:8-18.
[91] *Id.* at 132:1-3.
[92] *Id.* at 132:4 – 133:1.
[93] *Id.* at 132:11-21.

21

Additionally, according to Dr. Martin, Clonazepam was not on the list of medications she received from Defendant's family prior to his incarceration, [94] and it was not "on his pharmacy records that [she] received from his pharmacy."[95] Ultimately, given the addictive nature of Clonazepam and the fact it was not identified when Defendant was incarcerated at HRYCI, Dr. Martin substituted Topiramate for Clonazepam.[96]

Defendant also takes issue with DOC's modification of the frequency and dosages of Gabapentin, prescribed by Dr. Zanjani to treat tremors and by Dr. Roh for pain management. As noted *supra*, in the community Defendant was receiving 600 milligrams of Gabapentin three times daily (1800 milligrams per day). While in HRYCI, and after consulting with a clinical pharmacist, Dr. Martin ordered that Defendant receive 1200 milligrams of Gabapentin twice a day (2400 milligrams daily).[97]

Addressing Defendant's claim that he should be receiving Gabapentin 600 milligrams three times per day, Dr. Martin acknowledged that while Gabapentin is commonly prescribed three times a day, it can be "administered twice a day," and in this case is administered in 1200 milligram doses twice a day – 600 milligrams more

---

[94] *Id.* at 144:19 – 145:10.
[95] *Id.* at 145:10-12. Dr. Martin reviewed pharmacy records from "Rite Aid and another pharmacy." *Id.* at 147:3-4.
[96] D.I. 96, Evidentiary Hrg. Tr. at 18:7-21. There is no record evidence that Topiramate was an inappropriate substitution for Clonazepam.
[97] *Id.* at 7:10-12.

daily than Defendant had been receiving. According to Dr. Martin, it is neither proven or disproven that administering Gabapentin twice a day is not as effective as three times per day, and while 600 milligrams three times daily may be the "most studied dose," it is appropriate to prescribe it "in other ways."[98]

Additionally, the frequency and dosage of Defendant's Gabapentin medication was made only after Dr. Martin consulted with Dr. Crosby, a clinical pharmacist.[99] Dr. Martin explained:

> I had asked Dr. Crosby to look into the dosing of Gabapentin and the bioavailability of the medications when it is dosed twice a day, or BID, versus when it's dosed three times a day, TID. And he did that for us and gave us the recommendations that we use in, not just in our facility, many other facilities, in dosing Gabapentin.
> So it wasn't, *per se*, my decision that BID was just better or worse or indifferent, it was a decision that was made in general for dosing the medication to a large number of patients.[100]

Dr. Martin's consultation with Dr. Crosby, a clinical pharmacist, before modifying the daily number and dose level of Gabapentin, was reasonable. And, neither Dr. Zanjani nor Dr. Roh suggested dosing Gabapentin 1200 milligrams twice a day was improper or harmful to Defendant's health or responsible for Defendant's worsening conditions.

---

[98] *Id.* at 154:12-23.
[99] *Id.* at 155:11-20.
[100] *Id.* at 155:22 – 156:6.

**(4) If the Court were aware of Defendant's health conditions during the first motion for sentence modification, Defendant would have received a lesser sentence.**

On January 4, 2023, this Court denied Defendant's first Motion to Modify Sentence.[101] In the Order denying Defendant's Motion, the sentencing judge reviewed his original sentence and noted aggravating factors were the "need for correctional treatment" and Defendant's "undue depreciation of offense."[102] The judge also noted "a mitigating factor of physical/mental impairment,"[103] specifically holding "[t]he Court considered [Defendant's] physical condition prior to sentencing. The Court noted his 'physical/mental impairment' as a mitigating factor when arriving at the sentence."[104]

And, before concluding the October 14, 2022 sentence did "not need to be modified or revisited," the judge considered Defendant's arguments and made "inquiries as to [Defendant's medical] treatment at Level V."[105] Contrary to Defendant's assertion, Defendant's medical conditions were accounted for both prior to sentencing and when considering Defendant's first motion for sentence modification. And after that review, the judge was satisfied the original sentence

---

[101] D.I. 64.

[102] *Id.* at ¶ 1.

[103] *Id.*

[104] D.I. 64, January 4, 2023 Order Denying Jeffrey A. King's Motion for Home Confinement/Compassionate Release.

[105] *Id.* at ¶ 5.

was appropriate. Defendant's argument to the contrary is not supported by the record.

### (5) This case is distinguishable from *DeRoche* and *Horta*.

Finally, Defendant argues *State v. DeRoche*[106] and *State v. Horta*[107] provide persuasive legal authority in the context of a Rule 35(b) motion to grant a sentence modification. In *DeRoche*, the Defendant suffered from severe health problems -- including heart problems and high blood pressure.[108] On several occasions, DeRoche was denied access to necessary medication,[109] and he would sometimes refuse to take his medication based on a change in the appearance of the medication.[110] At one point, DOC failed to administer DeRoche's heart medication for more than one month.[111] Five days after his heart medication was finally administered, DeRoche suffered a heart attack.[112] A treating physician later testified that she had more success controlling Defendant's high blood pressure while the defendant was in the hospital, compared to when DeRoche was released back to DOC custody.[113] The physician also opined that "Defendant's elevated blood pressure when he was not in the hospital may be attributed to the fact that he is not

---

[106] *DeRoche*, 2003 WL 22293654, at *5.
[107] *State v. Horta*, 2022 WL 1564116 (Del. Super. Apr. 13, 2022).
[108] *Deroche*, 2003 WL 22293654, at *1.
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.*

receiving all of his medications in a timely and orderly fashion."[114] Under these specific circumstances, this Court found that DeRoche's history of severe medical issues and inadequate medical care as evidenced by the failure to provide DeRoche heart medication for more than one month and his subsequent heart attack demonstrated the DOC had in fact failed to provide him with adequate medical care under 11 *Del. C.* § 6536, which constituted extraordinary circumstances warranting a partial reduction of sentence.[115]

Defendant also relies upon *State v. Horta* as persuasive authority to grant a modification of sentence. In *Horta*, the modification of sentence request was filed by DOC pursuant to 11 *Del. C.* § 4217.[116] The Court also concluded the Defendant was suffering from a "serious medical illness" warranting a sentence modification because: (1) Horta had terminal brain cancer, and was receiving chemotherapy; (2) Horta had developed seizures, headaches, and worsened vision as a consequence of the brain cancer and (3) he had been frequently housed in the infirmary, and had been noted as a "high risk for falls and injuries" by his treating surgeon.[117]

Both *DeRoche* and *Horta* are distinguishable from the record before this Court. When contrasting Defendant's claims to the defendant in *DeRoche*,

---

[114] *Id.*
[115] *Id.*
[116] *Horta*, 2022 WL 1564116 *1.
[117] *Id.* at *2.

26

Defendant has not demonstrated an outright failure by DOC to administer Defendant's medications for an extended period of time, and there is no identified harm that has come from Defendant's missed medications. Moreover, the DOC has instituted corrective actions which has all but eliminated prescription medication administration issues. Under these circumstances, Defendant has failed to demonstrate "extraordinary circumstances" for this Court to reconsider his sentence.[118]

*Horta* is also distinguishable. First, *Horta* involved a motion for sentence modification filed by the DOC on behalf of the Defendant. And Horta was receiving chemotherapy while suffering from terminal brain cancer, which caused seizures. Defendant's treatment is for the purpose of managing common medical conditions such as asthma, COPD, tremors, and degenerative disc disease. These conditions are not terminal medical conditions. Second, the record before this Court does not indicate Defendant is so seriously ill that he has been frequently housed in the infirmary for ongoing medical care. Third, Horta's "high risk for falls and injuries" due to advancing brain cancer differs greatly in seriousness and degree from the "high risk of hospitalization and death" assertion made by Dr. Satriale *if Defendant does not take his medications as prescribed*.

---

[118]  *See also State v. Comrie*, 2017 WL 1403324, at *2 (DOC's failure to provide Defendant one dose of AIDS medication monthly was insufficient to constitute "extraordinary circumstances.")

Defendant has not made a showing of any specific medical condition which has resulted from or been exacerbated by DOC's medical treatment in HRYCI. He is receiving appropriate and timely medication from DOC staff, and is not, in any meaningful way, following medical advice to try and better his circumstances. As such, he has failed to demonstrate "extraordinary circumstances" which warrant a modification of sentence.

## VI. CONCLUSION

As this is Defendant's second Motion for Modification of Sentence, it is procedurally barred as repetitive. It is also procedurally barred as Defendant has filed an untimely motion and has failed to establish "extraordinary circumstances" which warrant reconsideration of the original sentence imposed.

**THEREFORE, I RECOMMEND** that Jeffrey A. King's Motion for Modification of Sentence be **DENIED.**

/s/ Martin B. O'Connor
**COMMISSIONER**

Cc: Prothonotary
Annemarie Puit, Deputy Attorney General
Erika Flaschner, Deputy Attorney General
Zachary George, Esquire, Counsel for Defendant

28